## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE

HYC LOGISTICS INC,                                    Case No. 2:23-cv-02050-TLP-tmp
    *Plaintiff/Counter-Defendant*

562 EXPRESS, INC.,
    *Counter-Defendant*

vs.

OJCOMMERCE, LLC,
    *Defendant/Counter-Plaintiff*

    and

JACOB WEISS,
    *Defendant.*

---

OJ COMMERCE, LLC,                                     Case No. 2:23-cv-02226-TLP-atc
    *Plaintiff*

vs.

562 EXPRESS, INC.,
    *Defendant.*

---

## DEFENDANT OJ COMMERCE, LLC MOTION FOR TREBLE DAMAGES AND INCORPORATED MEMORANDUM OF LAW UNDER THE TENNESSEE CONSUMER PROTECTION ACT

OJ Commerce, LLC ("OJC"), by and through undersigned counsel, respectfully moves this

Court to treble its damages caused by HYC's violations of the Tennessee Consumer Protection

Act (TCPA). The evidence at trial proved that HYC's violations of the TCPA were knowing

violations. And the factors laid out in the TCPA support a finding that OJC is entitled to treble

damages. Not only did HYC act deceptively with respect to its conduct in violating the TCPA,

but the jury also found that HYC committed fraud throughout the parties' relationship.

Additionally, the damage was significant in this case, as the jury found that OJC suffered

$701,508.81 in actual damages as a result of HYC's deceptive and unfair acts.  Based on Tennessee

law and HYC's fraud and deception, it is clear that HYC did not act with good faith in violating

the TCPA.  OJC, therefore, respectfully requests that this Court treble its damages for HYC's

violations of the TCPA and award OJC $2,104,526.43. [1]

## RELEVANT PROOF AT TRIAL

On August 15, 2022, OJC and HYC entered into a contract and later negotiated more

specific terms regarding prices.  HYC inserted a term into the form contract that Tennessee law

would govern the relationship between the parties, and OJC agreed.  (Trial Ex. 3 at ¶ 23.)  The

contract provides that HYC was to act as the agent of OJC.  (*Id.* at ¶ 2.)  The parties then agreed

to specific rates for two different warehouses.  (Trial Exs. 4 & 5.)   Importantly, as a part of the

negotiation of the specific rates, Itamar Aranov, an HYC employee and the point person with OJC,

stated that HYC was "billing [accessorial fees] at cost we don't make any money on the accessorial

charges…." (Trial Ex. 5.)

During the trial, HYC emphasized that it was a very experienced brokerage and logistics

company that belonged to the National Customs Brokers & Forwarders Association of America,

Inc. (NCBFAA).  While OJC is a large retail company, it relies on others for brokerage and

logistics services.

The relationship between OJC and HYC ultimately broke down because HYC repeatedly

charged extensive fees on top of the trucking charges that had been agreed.  HYC tried to charge

---

1.        OJC also intends to request reasonable attorney's fees and costs under the TCPA.  Tenn. Code
Ann. § 47-18-109(e)(1).  OJC will comply with the timing and content requirements laid out in Local Rule 54.1(b)
when it files its motion for attorney's fees and costs.

OJC for numerous per diems and sent separate invoices to OJC for the per diems beginning on November 16, 2022. At trial, the evidence showed that these per diems were never paid, were waived, and, thus, should not have been included in the lien amount. Nonetheless, in its demand for payment to OJC, HYC included the full per diem amounts. Aaron Hernandez, the President of 562 Express, testified by deposition that almost all the per diems were waived and were never paid. Uri Silver admitted that he had no proof that any of them were ever paid, and HYC and 562 Express failed to offer any proof that any per diems were ever invoiced to 562 Express or HYC. Silver testified reluctantly based on his deposition that per diems never should have been invoiced to OJC if they were not actually paid, and he admitted that a per diem that was waived should not have been charged to OJC. Yet, approximately $49,215 was charged for per diems that were never paid and that had largely been waived. (*See* Trial Ex. 8(b) for the full set of per diem invoices.)

The waiver of the per diems was not a surprise to HYC and 562 Express, and HYC knew that these per diems were never going to be paid. Emails between Aronov, Silver, and Hernandez showed that Hernandez had a photoshopping system to get all the per diems waived. (Trial Ex. 15.) Meanwhile, HYC knew that at least five of the per diems had been waived at the time that HYC invoiced them to OJC. (Trial Exs. 26-29; Trial Ex. 30.) Additionally, there were approximately 20 other per diems where HYC knew that a waiver had been sought. (Trial Ex. 30.) HYC sent invoices for those per diems to OJC in spite of this fact. (Trial Ex. 30, Trial Ex. 8(b).) Meanwhile, Uri Silver in both the Verified Complaint and his Declaration, which was made after every single per diem had been waived, continued to claim under oath that HYC was owed the $49,215.00 for per diems that had been invoiced to OJC. (*See* Trial Ex. 31 and 32.[2])

---

2.     While these Exhibits were admitted for ID purposes only, they confirm the testimony that was given by Silver on the stand.

3

As Silver admitted, the undisputed evidence also showed that HYC improperly billed OJC for "US Trucking" charges that were for the wrong amount and on containers for which OJC had already been billed for the trucking charge. (Trial Ex. 8.)

OJC also offered testimony that the congestion fees and bobtails should never have been charged to OJC. In the case of congestion fees, Aranov testified that this was an accessorial charge, which HYC agreed would be billed at cost, yet HYC never showed any proof that any congestion fees were ever charged to HYC or 562 Express. (*Compare* Trial Ex. 8 (HYC invoices to OJC), *with* Trial Ex. 25 (562 Express Invoices to HYC.) Despite the fact that HYC incurred no cost for congestion fees, HYC passed on a congestion fee charge on every single container that was invoiced to OJC. (Trial Ex. 8 (showing that the only invoices that do not include a congestion fee were the invoices for per diems).) Congestion fees totaled more than $32,000 of the $307,310 that HYC claimed was owed by OJC. (Trial Ex. 45.)

On the bobtail fees, the email evidence showed that, throughout the relationship, bobtails were supposed to be approved by OJC and Weiss before they were incurred. (Trial Exs. 12, 13, 14, & 24.) While Silver and Aronov tried to argue that bobtails did not need to be approved at first, Aronov forwarded an August 2022 email to Silver in January 2023 where he noted that the bobtails had not actually been approved by Weiss. (Trial Ex. 24.) Weiss testified that OJC never approved a bobtail, and HYC offered no evidence that any bobtails were ever actually approved. The bobtails that were invoiced to OJC totaled approximately $29,000.

At one point during the relationship, HYC, through Aronov and Silver, attempted to change the definition of a bobtail and double-charge OJC. Despite Aronov and Silver's sworn testimony on the stand about the definition of a bobtail, Aronov ultimately admitted that HYC tried to change the meaning of bobtail. An email exchange among Silver, Aronov, and Weiss showed this blatant

4

attempt by HYC to unilaterally change the definition of a bobtail to its sole benefit so that it could charge OJC more improper fees.  (Trial Ex. 13.)

The testimony and evidence showed that, throughout the relationship, OJC raised concerns about these extra charges and never received answers from HYC.  Weiss, Aronov, and Silver all agreed that OJC and Weiss raised concerns about the accessorial fees that were being invoiced.  The email exchanges between HYC and OJC showed as much.  (*See, e.g.*, Trial Exs. 12, 13, 14, 16, 24, 40, and 41.)  Aronov and Silver claimed that HYC provided the necessary information to OJC, yet HYC offered no evidence that the information was actually provided.  Weiss testified that HYC refused to provide the requested information regarding accessorial fees, including congestion fees, bobtails, and per diems, until multiple motions to compel were filed during the pendency of this lawsuit.

On December 13, 2022, Jacob Weiss, the President of OJC, messaged Uri Silver, the President of HYC, at 4:11 p.m. in Israel, which is 6:11 a.m. in California, that OJC and HYC would need to "move on" and that it didn't "make[] sense to for [OJC and HYC] to continue." (Trial Ex. 33.)  Both Uri Silver and Jacob Weiss testified at trial that they understood that these messages meant that HYC and OJC would no longer be working together.  Following this exchange between Silver and Weiss, OJC then sent a series of emails to HYC to formally end the agency relationship between OJC and HYC.  Michael Jackson, an OJC employee, sent the first email:

> Hi HYC Team,
>
> We would like to request you to kindly cancel all pick-up appointments scheduled and kindly confirmed the same within an hour.  Please also halt any further scheduling of appointments. OJC will pay for return of the picked empty containers that are currently being handled by HYC.

5

(Trial Ex. 18, Email sent on December 13, 2022 by Michael Jackson.)  Then, Jacob Weiss sent a

follow up email when HYC did not respond:

> Below 10 containers show on your sheet as some having appointments and LFD
> within the next 3 days. Please cancel all open appointments and confirm so we can
> rebook.   [Listing ten containers that included the nine containers that were
> ultimately taken by HYC through 562]

(*Id.*, Email Sent by Jacob Weiss at 12:23 p.m. on December 13, 2022.)  Weiss then followed up

again when no response came from HYC:

> @HYC Team,
>
> it appears my access to the Google doc with all information about OJC Containers
> has been removed.
>
> Please advise on our request to cancel ALL pending appointments so we can secure
> our own. This request has now been pending for 1.5 hours with NO RESPONSE.
> Further delay may result in OJC incurring unexpected fees at the terminal, as
> appointments might not be available.
>
> Please be on notice that any fees occurring as a result, will fully be the responsibility
> of HYC.
>
> Thanks,
> Jacob Weiss

(Trial Ex. 18, Email at 1:32 p.m. on December 13, 2022.)  HYC still did not respond and instead

cut off OJC's access to the shared google sheet with information regarding the containers, so Weiss

sent another follow up email:

> Its now been 4 hours and we haven't received a response to our request, and the
> Google sheet has not been updated regarding the containers listed below. Again, I
> am asking for a quick update on cancelling all the appointments, so we can secure
> our own and avoid any additional fees, delaying the response will most likely result
> in fees that we would need to collect from HYC.
>
> Jacob

(Trial Ex. 18, Email at 4:00 p.m. on December 13, 2022.)  Finally, still having received no response

from HYC, Weiss sent the following email:

Dear HYC Team.

You are hereby advised not to pick up any containers from OJCommerce at any port or terminal. Any authority previously given for such pickups, is hereby revoked. In addition, failure by HYC to cancel immediately any pending appointments may result in delays, additional demurrage charges, and/or other fees, for which you will be held fully responsible.

Govern yourself accordingly,

Jacob Weiss

(Trial Ex. 18, Email at 5:53 p.m. on December 13, 2022.)

During the trial, Itamar Aranov and Uri Silver testified that they received these emails and intentionally ignored them. Silver testified that he specifically told Aranov not to respond. Silver acknowledged that, after receiving these emails, HYC then had 562 Express go to the port and pick up the nine containers belonging to OJC at issue in the lawsuit. (*See also* Trial Ex. 34 (showing that at least one of the appointments for pick up of the nine containers was made after the Whats App messages between Silver and Weiss).) In doing so, HYC and 562 Express failed to disclose to the port that OJC had revoked their authority to pick up OJC's containers when the nine containers were picked up.

After receiving the termination emails and then seizing the nine containers, on December 15, 2022, HYC sent its notice of intent to exercise a lien on the nine containers to OJC claiming that it was owed $307,310.00. (Trial Ex. 46.) This $307,310.00 included $49,215 for per diems, $32,000 for congestion fees, and $29,000 for bobtails.

The undisputed evidence showed that the nine containers contained goods that were purchased for $701,508.81 and would have been sold for a profit of $238,279.54. (Trial Ex. 38.)

7

**JURY VERDICT**

The jury found that HYC engaged in an unfair or deceptive act or practice under the Tennessee Consumer Protection Act (TCPA) when it failed to disclose that OJC had terminated its agency relationship when HYC had 562 Express seize the nine containers from the port. (Verdict, ECF 302.)  The jury awarded $701,508.81 in damages to OJC for this claim.  (Verdict, ECF 302.)  This was the cost of the goods in the nine containers.  (Trial Ex. 38.)  The jury also found that HYC committed intentional and/or reckless misrepresentation and awarded $238,279.45 for this claim.  (Verdict, ECF 302.)  This was the amount of profit that would have been gained if the contents of the nine containers could have been sold by OJC.  (Trial Ex. 38.)

Even though the jury found that HYC committed fraud and deception, it found that OJC committed the first material breach and awarded $587,641.04 in damages to HYC.  (Verdict, ECF 302.)  This amount was the amount that HYC sought for unpaid invoices, storage fees, and interest minus the full $49,215.00 for per diems.  (*Compare* Trial Ex. 23 (ID only), *with* Trial Ex. 45 (showing total per diem amount).)[3]  Although the jury found that fraudulent amounts had been included in HYC's invoices and its demand to OJC, the jury found that HYC properly exercised its lien right under the contract.  (Verdict, ECF 302.)

**STANDARD FOR TREBLE DAMAGES UNDER THE TCPA**

Under Tenn. Code Ann. § 47-18-109(a)(3), when "the court finds that the use or employment of the unfair or deceptive act or practice was a willful or knowing violation of this part, the court may award three (3) times the actual damages sustained."  "Knowing" is defined as "actual awareness of the falsity or deception, but actual awareness may be inferred where objective

---

3.    Counsel for OJC asked counsel for HYC by email multiple times to provide the charts that he showed in closing argument so that they could be attached to this motion to show the damages calculations, but, to date, counsel for HYC has refused to provide them.

manifestations indicate that a reasonable person would have known or would have had reason to know of the falsity or deception." Tenn. Code Ann. § 47-18-103(15).

The TCPA provides factors for courts to consider in determining whether to award treble damages: "(A) The competence of the . . . person; (B) The nature of the deception or coercion practiced upon the . . . person; (C) The damage to the . . . person; and (D) The good faith of the person found to have violated this part." Tenn. Code Ann. § 47-18-109(a)(4). "Person" is defined as "a natural person, individual, governmental agency, partnership, corporation, trust, estate, incorporated or unincorporated association, and any other legal or commercial entity however organized." Tenn. Code Ann. § 47-18-103(18).

While an award of treble damages rests within the court's discretion, the TCPA "is to be liberally construed to protect consumers and others from those who engage in deceptive act[s] or practices." *Smith v. Corona Corp. v. Pelikan, Inc.*, 784 F. Supp. 452, 483 (M.D. Tenn. 1992) (quoting *Haverlah v. Memphis Aviation, Inc.*, 674 S.W.2d 297, 305 (Tenn. Ct. App. 1984) and citing *Akers v. Bonifasi*, 629 F. Supp. 1212, 1223 (M.D. Tenn. 1984).) Furthermore, "discretion is not whim. In a system of laws discretion is rarely without limits, even when the statute does not specify any limits upon the district courts' discretion. A motion to a court's discretion is a motion, not to its inclination, but to its judgment; and its judgment is to be guided by sound legal principles." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103 (2016) (internal citation and quotation omitted).

## LAW AND ARGUMENT

The Court should treble OJC's damages because HYC's violation of the TCPA was done knowingly and the factors weigh in favor of treble damages. HYC did not dispute that it received the emails from OJC terminating its agency status and instead admittedly ignored them. Even

worse, HYC, through 562 Express, then went to the port and deceived the port authorities into believing that HYC and 562 Express were still acting as the agents of OJC when, in reality, they were acting in their own interests to seize OJC's goods with no intention of delivering the goods to OJC. While OJC is a large retailer, it relies on others for logistics services, and, here, the evidence showed that HYC was a sophisticated and experienced logistics company that is a member of the NCBFAA, which HYC repeatedly emphasized. The deception was also significant, as HYC misrepresented itself as an agent of OJC to the port authorities, consciously ignored emails from OJC, cut off OJC's access to information regarding its own containers, and committed additional fraud against OJC. And the actual damage to OJC was high. Finally, there was no good faith on the part of HYC, as it committed additional fraud that it attempted to cover up throughout this litigation.

## I.   HYC's Violations Were Done Knowingly.

Here, there can be no doubt that HYC had an actual awareness of the deception that it perpetrated. The jury determined that HYC violated the Tennessee Consumer Protection Act by committing unfair or deceptive acts. (Verdict, ECF 302.) In so finding, the jury found that HYC committed "unfair or deceptive" acts by causing "likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another." T.P.I.- Civil 11.45 (including the proper insert from Tenn. Code Ann. § 47-18-104(b)(3)). The Court used the pattern jury instruction and included the specifics allegations pleaded by OJC: HYC acted deceptively or unfairly when it sent 562 Express to pick up the nine containers from the port but concealed from the port that its agency status with OJC had been terminated.

When HYC did so, it had an actual awareness of the deception. Tenn. Code Ann. § 47-18-103(15) (defining "Knowing"). Uri Silver testified that he was aware that OJC had sent a series

of emails to HYC terminating their agency relationship, and HYC made a deliberate decision to

not respond. HYC hid what it was doing from the port authorities and from OJC by failing to

respond and cutting off access to the shared google drive. (Trial Ex. 18.) Silver testified that HYC

acted in this manner so that it could seize OJC's goods from the port. The "objective

manifestations" by HYC show that it had no intention of ever delivering those goods to OJC, and

it did not do so after taking them from the port. Tenn. Code Ann. § 47-18-103(15) (defining

"Knowing"). The evidence proved that HYC knew exactly what it was doing when it went to the

port after the agency relationship was terminated.

Because HYC's violation was done knowingly, an award of treble damages is appropriate

under the TCPA. Tenn. Code Ann. § 47-18-109(a)(3)

**II.    The TCPA Factors Weigh in Favor of An Award of Treble Damages.**

All four factors weigh heavily in favor of an award of treble damages in this case based on

HYC's egregious conduct. The first factor is the "competence of the . . . person," here OJC. Tenn.

Code Ann. § 47-18-109(a)(4)(A). While OJC is competent in its business, it is not in the logistics

business. In *In re Batson*, the Court drew a similar distinction. 568 B.R. 281 (M.D. Tenn. 2017).

In that case, the violators of the TCPA were in the construction business for 30 years while the

consumer was not, and the violator took advantage of that fact:

> Unlike the [consumers] who were not in the construction business, the [violators]
> were in a position to know whether an Impact Fee was required. Moreover, the
> [violators] invoiced and received payment from the [consumers] for the Impact Fee
> and Contractor Fee as though the [violators] had already paid it even though no
> such fee had been paid.

*Id.* at 292. Here, OJC is likewise not a logistics company, let alone an experienced one, while

HYC is. Similarly, in *Myers v. Hexagon Co., L.L.C.*, the Court noted that the consumers were

11

"intelligent and competent," but it still awarded treble damages.  54 F. Supp. 2d 742, 756 (E.D.

Tenn. 1998).

Based on the decision in *In re Batson* and HYC's conduct in this case, the fourth factor—

"[t]he good faith of the person found to have violated this part," Tenn. Code Ann. § 47-18-

109(a)(4)—also weighs in favor of treble damages. The *In re Batson* Court noted that the above

conduct by the violators was also "not indicative of good faith."  568 B.R. at 292.  The same is

true in our case.  The evidence showed that HYC did something almost identical to what the

violators did in *In re Batson*.  In our case, HYC sent invoices for a fee—the per diems—"as

though" HYC "had already paid it even though no such fee had been paid."  *See In re Batson*, 568

B.R. at 292.  The jury found HYC liable for fraud as a result of this conduct and thus confirmed

that HYC did not act in good faith.

The second factor—"[t]he nature of the deception or coercion practiced upon the . . .

person"—also weighs heavily in favor of treble damages.  Tenn. Code Ann. § 47-18-109(a)(4)(B).

HYC tried to hide the evidence that the per diems were waived.  Uri Silver stated under oath in the

Verified Complaint and his Declaration that the per diems were still owed to HYC even though

HYC never paid any per diems and had, in fact, received numerous emails from the port authorities

that the per diems were waived.  (Trial Exs. 30, 31, and 32.)  These emails were not produced until

multiple motions to compel had to be filed with the Court, which is further evidence of HYC's bad

faith in this case.  *See Am. Nat. Property and Cas. Co. v. Stutte*, 105 F. Supp. 3d 849, 854 (finding

that "post-litigation conduct may be relevant to whether [the conduct] was in bad faith").

And, in addition to the fraud that the jury found, the specific nature of the deception

underlying the TCPA claim weighs in favor of awarding treble damages.  Tenn. Code Ann. § 47-

18-109(a)(4)(B).  Not only did HYC deliberately ignore OJC's emails regarding the nine

12

containers and terminating the agency relationship, but it acted especially egregiously when it cut

off OJC's access to the data to monitor its own containers: "[M]y access to the Google doc with

all information about OJC Containers has been removed." (Trial Ex. 18, Email at 1:32 p.m. on

December 13, 2022, from Jacob Weiss.) At the same time, HYC sent its agents to the port under

the guise that it was still acting as the agent of OJC. HYC's actions were not only deceptive to the

port, but they were also deceptive to OJC.

Finally, the third factor—"[t]he damage to the . . . person"—also weighs heavily in favor

of trebling the damages. Tenn. Code Ann. § 47-18-109(a)(4). The damages to OJC were

significant and far exceed most of the cases where treble damages have been awarded. *See, e.g.*,

*Myers*, 54 F. Supp. 2d at 756 (finding 5,726.16 in actual damages); *In re Batson*, 568 B.R. at 292

(finding $3,300 in actual damages). In *Smith Corona Corp. v. Pelikan, Inc.*, in awarding treble

damages on $41,000 in actual damages, the Court stated:

> [I]n light of the liberal construction to be afforded this statute, [] the enhancement
> of damages in this case would serve the purposes of punishment and deterrence
> articulated in *Spence* and would "protect legitimate business-enterprises from those
> who engage in unfair or deceptive acts or practices in the conduct of trade or
> commerce in part or wholly within Tennessee . . . ."

784 F. Supp. 452, 484 (M.D. Tenn. 1992) (quoting *Akers v. Bonifasi*, 629 F. Supp. 1212 (M.D.

Tenn. 1985)). The Court noted that the injury was acute in that case. *Id.* Here, the jury determined

that OJC suffered a far greater amount of $701,508.81 in actual damages as a result of HYC's

violations of the TCPA than the plaintiff did in *Smith Corona Corp*.

HYC acted deceptively and in bad faith throughout the relationship, and, as a result, HYC

caused OJC immense damage. Respectfully, all four factors weigh in favor of trebling OJC's

damages to $2,104,526.43.

## CONCLUSION

For the foregoing reasons, OJC respectfully requests that the Court treble his TCPA claim

damages to $2,104,526.43.

Respectfully submitted,

*/s/ L. Mathew Jehl*
Lawrence J. Laurenzi (TN9529)
Nathan A. Bicks (TN10903)
L. Mathew Jehl (TN38251)
BURCH, PORTER & JOHNSON, PLLC
130 North Court Avenue
Memphis, TN  38103
Phone:  (901) 524-5000
Fax: (901) 524-5024
Email:  LLaurenzi@bpjlaw.com
           NBicks@bpjlaw.com
           MJehl@bpjlaw.com

Aaron W. Davis
VALHALLA LEGAL, PLLC
P.O. Box 735
Custer, SD 57730-0735
Phone: 763-957-2397
Email: davis@valhallalegal.com

Shlomo Y. Hecht
Shlomo Y. Hecht, P.A.
3076 N Commerce Parkway
Miramar, FL 33025
Phone: 954-861-0025
Email: sam@hechtlawpa.com

***Attorneys for OJ Commerce, LLC
and Jacob Weiss***

## CERTIFICATE OF SERVICE

I certify that on January 17, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and served this document upon all counsel of record.

*/s/ L. Mathew Jehl*
L. Mathew Jehl

14